# CHARLESTON.

THE CLAY COUNTY COURT *v.* FRANK T. ADAMS

(No. 6679)

Submitted September 16, 1930. Decided September 30, 1930.

422

*E. G. Pierson,* Prosecuting Attorney, *Eakle & Eakle* and *Brown, Jackson & Knight,* for plaintiffs in error.

*Davis, Painter & Silverstein,* for defendant in error.

LIVELY, PRESIDENT:

. In this condemnation suit, the commissioner's report awarded damages to Adams in the sum of $1,000.00; both parties excepted, and the case went to a jury which heard the evidence, viewed the premises, and awarded a like sum. Plaintiff moved to set aside the verdict, the court overruled the motion, and entered judgment. Plaintiff, the county court, prosecutes error.

Adams owned the coal under a tract of about 19 acres of land, abutting on Elk River, near the mouth of O'Briens Creek in Otter District of Clay County, and the usual mining rights and privileges over the surface. His predecessor in title had opened a mine thereon from which a tramway, about 2,100 feet long, had been constructed with a slight down grade from the mine mouth to a tipple erected against a rock point overlooking the river at an elevation of about 828.9 feet, and above a county road, which ran between the foot of the rock point and the river. A cable was anchored into the rock at the tipple, and extended above the road and river, which cable conveyed coal in a large iron bucket of three-ton capacity across to a railroad on the south side of the river. The tipple

was supported by poles, some of which were placed at a distance of 15 to 17 feet from the traveled portion of the road. (The witnesses disagree as to the distance). From the tipple a chute ran down to the road to convey coal to wagons on the roadbed. The right of way for this road was 30 feet wide, measured from the center of the traveled part, a distance of 15 feet on each side. Whether 15 feet from the center of the traveled way measured toward the tipple placed some of the supports of the tipple in the right of way, is a matter of controversy. It is quite clear that the chute extended over the right of way. The State Road Commission took over the road and began the construction of a state highway and required the county court to furnish a right of way 105 feet wide. Necessarily, the project took in the site of the tipple, whether it was partly on the 30 foot right of way or entirely off of it. The tipple appears to have been a temporary affair, and was much decayed. Notice was given to Adams' superintendent to move the tipple, but he did not do so, and the contractor says he offered to remove it, but was told by the superintendent to shoot it into the river. At any rate, holes for the excavation were bored under the tipple, or near it, and dynamite used, which blew up the tipple. Adams stopped further work by injunction, and this condemnation suit was promptly instituted to ascertain what compensation should be paid Adams for his structures, buildings, minerals and mining rights taken or damaged by the public improvement.

It will be noted that Adams did not own the surface of the land. He owned the coal thereunder, and the tramway, tipple, cable and appliances for getting out the coal to transportation. The damage is to his easement over the land, and his mining rights therein. When Adams ascertained that the road would take the tipple site, he selected a new location for his tipple a short distance from the old at an elevation of 861.9 feet or 33 feet higher than the old site, which, instead of being an average down grade as in the old tram, was an average up grade in a slight degree, thus requiring power to get the coal from the drift mouth to the new tipple, whereas, on the old tram, the cars moved down to the tipple by gravitation. He said it would cost ten cents per ton more to move the coal to the new

tipple than to the old one. He moved the machinery from the old site to the new one. He estimated the damage done to his mining operations at $12,000.00. He fixed the reasonable cost of a new tramway to replace the old one taken at $2,-000.00. He constructed a road to haul his machinery from the old to the new site and to haul material to the new tram, which, he said, was necessary and that the reasonable cost of such a road would be $500.00. Barnhart, civil engineer for Adams, says the old site would have been used had it not been taken, after repairing the tipple at a cost of $500.00, and that the new site was the only practicable one left. He confirmed Adams in the character and amount of work done in order to get the coal out, and estimates the damage to the mining operations at $10,500.00.

It appears that the predecessor in title to the coal and mining rights did not have permission from the county authorities to erect the tipple or any part of it on the thirty foot right of way, or to erect the cable over the road, and there were complaints from the road patrolman to the former owner, by reason of coal accumulating in the old wagon roadbed from the tipple and bucket. Much time was consumed in the trial over the controversy, above referred to, as to the exact location of the tipple with reference to the 30 foot right of way for the old road. There was no evidence of the value of the old tipple which the contractor blasted into the river.

The errors relied upon are: (1) Admission of improper evidence on behalf of Adams; (2) giving and refusing instructions; and (3) refusal to declare a mistrial, when the court was advised that a juror was absent at the view.

It is argued that the evidence for defendant did not give a proper basis for the ascertainment of damages. He was permitted to state the costs necessitated by the taking of his old tipple site, namely, the location of a new tipple at the most practicable point, the building of a new tramway, the change in the grade from gravitation in the old tram, and the increased cost per ton of coal by reason thereof, and the reasonable cost of such new tramway, also the reasonable costs of removal of his equipment to the new site. Then after giving these items of damage, he was permitted to say that he estimated his entire

damage at $12,000.00. The true measure of damages to the residue in condemnation suits is the difference in value immediately before and immediately after taking, without charging the owner with general benefits. That is the measure to be used by the jury in arriving at its verdict. A witness may state his opinion of the difference in value of the residue occasioned by the taking, but he must give some facts on which his opinion is based, else it would be of no benefit. No witness attempted to give his opinion of the value before and the value after the improvement. It is permissible for a witness to do so, after giving a basis for his opinion, but it is not necessary for him to give his opinion. Adams' opinion that his mining rights had been damaged to the extent of $12,000.00, in the light of what he had to do to place his property in as good condition immediately after the taking as it was before, was not error. It was his mere opinion, and evidently the jury gave his opinion no weight. He was subjected to a full cross-examination as to the basis of his opinion, and we can see no prejudicial error. *Railroad Co.* v. *Coal Co.,* 75 W. Va., 423; *Kay* v. *Glade Creek R. R. Co.,* 47 W. Va. 467. In *Transportation Co.* v. *Wilson,* 70 W. Va. 157, the witnesses had given their opinion that defendant's land had been damaged $2,000.00 without any data to support their mere naked opinions; the jury had *not* viewed the premises, and the court held the introduction of such opinion evidence to be error, as the verdict seemed to have been based on this naked opinion evidence alone. In the instant case, we have the data from which the witness expressed his opinion, and the view of the premises by the jury. What sum should be given defendant to put him in as good a condition after the taking as he was in before? He is entitled to have included in the award reasonable expenses necessarily incurred, occasioned by the taking, to preserve the property not taken and render it fit for use and enjoyment. *Monongahela Valley Traction Co.* v. *Windom,* 78 W. Va. 390; *Wood* v. *County Court,* 100 W. Va. 29. What sum would save him harmless for the damages done to his mining property? The jury may have concluded that his establishment of a new tipple at another point was not necessary, and that he could have continued to use the old site and the old tram by the ex-

penditure of $1,000.00, after they had viewed the premises. Peculiar weight is given to the verdict where a view has been had. *Guyandotte Valley Ry. Co.* v. *Buskirk,* 57 W. Va. 417.

We next come to the instructions. Plaintiff offered three instructions, all of which were refused, and the court gave a comprehensive instruction of its own preparation. By plaintiff's instruction No. 1, the jury would have been told the proper rule for ascertaining damages for land actually taken, and in ascertaining damages to the residue, less any special benefits, and excluding general benefits. The court's instruction contained the substance of the refused instructions, telling the jury that they should award defendant just compensation for the minerals, mining rights, buildings and other structures actually taken without regard to either general or special benefits; and that in addition to what was actually taken, he was entitled to compensation for damages to the residue of his minerals, mining rights, buildings and other structures, if any appeared from the evidence, less any special, but not general, benefits. It told them what were general and what were special benefits; that special benefits should be taken from the damage to the residue, if they found any damage to the residue, but that general benefits could not be taken therefrom. We think the court's instruction more apt than the one refused, because defendant owned no *land*. The damages, if any, were to his mining rights, structures and easements. We cannot see wherein plaintiff was prejudiced by refusal of its instruction No. 1. The court further instructed the jury that defendant was not entitled to compensation for the taking of the right of way for a road of 30 feet in width, but that he was entitled to compensation for damages to his leasehold estate for land taken beyond the 30 foot right of way for a road existing at the time of the taking, if they found any from the evidence and view. This part of the instruction is criticized because it does not tell the jury that a road 30 feet wide was there. The jury could not have been misled. The court told them they could not assess damages for what was done on a right of way for a road existing at the time of the taking thirty feet in width. The court's instruction further told the jury they "should take into consideration that before the taking,

defendant had a right to mine coal and deliver the same over the *existing road* until such time as the whole of the 30 feet might be required for public use, and so long as he did not obstruct the part of the 30 feet actually occupied by the public road, whereas, after the taking such right is subject to the restrictions, conditions and regulations prescribed by the State Road Commission, all of which is for your consideration in determining the amount that will make defendant whole by reason of the appropriation and use of the additional rights of way aforesaid." This part of the instruction is the main error relied upon by plaintiff in the giving and refusing of instructions. Plaintiff's instructions Nos. 2 and 3 would have told the jury, in substance, that there was a public highway 30 feet wide at that point, and that Adams never had a right to transport coal over it by cables across it, or over it except under regulations prescribed by the county court, and if they believed that he did not have such right from either the county court, or from the State Road Commission after the latter took over the road, then he was not entitled to any compensation because he could not transport coal from his land as conveniently or economically across the road as he could before the construction of the road began. Defendant's predecessor had transported coal over the road since about 1921, and defendant had acquired the operations in June, 1927. There was no evidence that either had obtained a permit from the county court. A patrolman had protested to the predecessor because of obstructions in the road by coal escaping from the tipple or bucket.

Plaintiff argues that the cable and bucket operations over the road was a nuisance per se and could be destroyed arbitrarily with immunity from liability by the county court, or commission; citing *City of Martinsburg* v. *Miles,* 95 W. Va. 391; *Davis* v. *Spragg,* 72 W. Va. 672; Elliot on Roads and Streets, sec. 830; *Standard Oil Co.* v. *Com.,* (Va.) 109 S. E. 316, and *O'Hanlin* v. *Oil Co.,* 54 W. Va. 510; *Coffindaffer* v. *Gas Co.,* 74 W. Va. 107, and *Transportation Co.* v. *Oil Co.,* 50 W. Va. 611, 615. Defendant's counsel argue that if their client had no right to transport coal over the road, then there was no occasion for condemnation.

The cases cited accentuate the well settled proposition that obstructions or encroachments on a road which interferes unreasonably or unnecessarily with its use by the public, or makes it dangerous for public travel are a public nuisance per se, even when they do not operate as an obstruction to travel. Public officers cannot barter or give away the right of the public to have free, safe and unobstructed passage over the public highways. To do so would be an excess of power. It does not follow that all cables, wires, bridges and passageways over the highway and in no way interfering with free, safe and unobstructed passage, are public nuisances per se. If they are per se nuisances, the public officials could not authorize their existence; there could be no lawful cables, bridges and passageways over a public road. Should they become dangerous, and that fact ascertained, they should be abated as public nuisances. Summary abatement of public nuisances is warranted under the police power in order to protect life and property; but "according to some authorities, the power of abatement by summary destruction does not extend to property that is susceptible of use for lawful purposes." 20 R. C. L. p. 488, sec. 100. And in *Com.* v. *Miller*, 139 Pa. St. 77, 21 Atl. 138, which was a prosecution for maintaining a public nuisance, it was held that the character of the location where the business was established, the nature and importance of such business, the length of time it had been in operation, the capital invested, and its influence upon the growth and prosperity of the community, were all proper facts to be considered by the jury. The law recognizes the right of an individual or company to transport power, products and the like over and across a highway subject to proper restrictions, conditions and regulations. The power to restrict and regulate is for the safety and convenience of the public, but it is not an arbitrary prohibitive power. This old road ran through the tract of land involved. The owner has the fee and owns from the "center of the earth to the sky", subject to the easement of passage over the surface. He, or defendant with proper authority from him, would have an undoubted right to use the fee under the road, so long as that use did not interfere with the easement. It seems that he should have the same right to use the

space above, if without interference with the public right. Both would be subject to regulations designed to fully protect the public. The law recognizes the right. As was said in the old case of *Perley* v. *Chandler,* 6 Mass. 453, 4 Am. Dec. 159: "But the soil and freehold remain in the owner, although encumbered with a way. And every use to which the land may be applied, and all the profits which may be derived from it, consistently with a continuance of the easement, the owner can lawfully claim." And in *Jackson* v. *Hathaway,* 15 Johns (N. Y.) 447, it was held that the owner of the fee retains the right to make any use of the land within the limits of the highway location above, below or upon the surface of the ground that does not interfere with the public easement, as the necessity of the public from time to time requires. Coal has been conveyed to railroad transportation by the use of this cable and bucket for several years with the knowledge and consent of the county court. So far as the record shows, no restrictions, conditions or regulations had been prescribed. The right was exercised by tacit permission. It was not a nuisance per se, and to shoot it down simply because it was there, and not because it was dangerous to the public, was, to say the least, a rather drastic destruction of a property right. It is an indictable offense to place obstructions in a highway. If the obstructions be not removed after ten days' notice to remove, damages of not less than one nor more than five dollars per day may be recovered. Sec. 184, chap. 43, Code 1923. Unlawful obstructions include "telegraph, telephone, trolley, or other poles and wires connected therewith erected on the public road in such way as to interfere with the use thereof, or any other thing which will prevent the easy, safe and convenient use of such public road for public travel." Sec. 185, chap. 43, Code 1923. And by amendment to this section by chapter 17, Acts 1925, such obstructions are declared public nuisances, and in addition to the remedies above set out, the county court or road commission may abate such nuisances by injunction. In order for an obstruction to be a public nuisance under the statute, it must be such as will prevent "easy, safe and convenient use of such public road for public travel." The landowner has the right subject to regulation and control; and

there was no error in refusing plaintiff's instructions Nos. 2 and 3, for they would have told the jury that he had no right to use his cable above the road unless that right had been given. While the court's instruction is not technically correct because the right of defendant to deliver his coal over the road was not qualified by telling them that his right was subject to regulations, conditions and control, yet we do not think the jury could have been misled by that omission under the evidence and circumstances. It appears in the evidence that the State Road Commission's contractor assisted defendant in the erection of the cable over the road at the new location, thus recognizing his right. There seems to have been no intention to deprive him of that right.

From the evidence, defendant might have been given a larger verdict, but he does not assign cross-error, and the amount of damages under the evidence and view of the premises was peculiarly within judgment of the jurors. The learned trial judge has approved that finding. It may be observed that the jury found the same amount as that contained in the report of the commissioners in condemnation, although that report was not before the jury, and the commissioners did not give evidence. The point of error concerning the absence of a juror at the view is not mentioned in plaintiff's brief, and will not be considered. Perceiving no reversible error in the admission of evidence, or in the refusal and giving of instructions, the judgment will be affirmed.      *Affirmed.*