289 S.E.2d 213

**WEST VIRGINIA DEPARTMENT OF HIGHWAYS, A Corporation, and Charles L. Miller, West Virginia Commissioner of Highways**

v.

**E. L. FISHER and Anna Margaret Fisher, Husband and Wife.**

No. 15379.

Supreme Court of Appeals of West Virginia.

March 22, 1982.

Rehearing Denied May 27, 1982.

Preiser & Wilson, L. Alvin Hunt, Charleston, for appellants.

Jack D. Huffman, Gassaway, for appellees.

McHUGH, Justice:

This action is before this Court upon the petition of the West Virginia Department of Highways (hereinafter "appellant"), and the commissioner of that department, for an appeal from the final order of the Circuit Court of Braxton County, West Virginia. Specifically, the appellant appeals to this Court from a verdict in the amount of $841,900 returned by a jury in favor of the appellees, E. L. Fisher and Anna Margaret Fisher, husband and wife. That verdict resulted from an eminent domain proceeding instituted by the appellant in circuit court. This Court has before it the petition for appeal, all matters of record, including a transcript of the trial in this matter, and the briefs and argument of counsel.

The appellee, E. L. Fisher, is a physician and has practiced medicine in Braxton County for more than 40 years. During the period in question, the appellees were the owners of a cattle farm in excess of 500 acres in Braxton County, West Virginia. That land fronted on U.S. Route 19 and W.Va. Route 4 and was located near Flatwoods, West Virginia. Pursuant to the construction of Interstate 79 through West Virginia, the appellant acquired, by eminent domain, right-of-ways and easements over approximately 80 acres of the appellees' property. That taking resulted in the construction of the Flatwoods interchange to Interstate 79.

The date of the taking of the appellees' property by the appellant was April 29, 1970, as designated by order of the circuit court pursuant to the eminent domain procedures outlined in *W.Va.Code*, 54–2–1, *et seq.* On August 19, 1970, a hearing was held before condemnation commissioners. Both the appellant and the appellees filed exceptions to the award of the commission-

ers, and a jury trial in circuit court resulted.

On August 4, 1980, a circuit court jury was selected by counsel for the parties. On September 10, 1980, however, that jury was discharged as the result of a mistrial, and new jury selection began on September 11, 1980. Trial then began, and on September 19, 1980, the jury returned its verdict compensating the appellees in the amount of $841,900 for the taking of their land. The circuit court entered judgment upon the jury verdict, and by order entered December 3, 1980, denied the appellant's post-trial motion. It is from the final order of the Circuit Court of Braxton County that the appellant appeals to this Court.

A substantial difference of opinion existed in this action with respect to the amount of compensation to which the appellees were entitled for the taking of their property. The appellees asserted that they were entitled to in excess of one million dollars for the taking. On the other hand, the appellant asserted that $38,500 was fair and just compensation for the taking.

During the trial, the appellee, Dr. Fisher, was called as a witness. He testified that his property taken by the appellant for highway construction had a fair market value in April, 1970, of $1,506,830. Furthermore, Dr. Fisher testified that the damage to the residue of his property was $196,970. Therefore, Dr. Fisher asserted that he was entitled to a total of $1,703,800 as fair and just compensation for the taking of his property by the appellant.[1] During his testimony, Dr. Fisher divided the property into categories based upon the characteristics of the property. Based upon those categories, values per acre were assigned to the property.

The appraisal witnesses who testified on behalf of the appellees were Harry Kyer and Wallace H. Hefner, Jr. At the time of

---

1. The law in this State is that in condemnation proceedings, a landowner may express his opinion concerning the value of his land. *West Virginia Department of Highways v. Sickles,* 161 W.Va. 409, 242 S.E.2d 567, 570 (1978); *Tennessee Gas Transmission Company v. Fox,* 134 W.Va. 106, 114, 58 S.E.2d 584, 590 (1950); Syl.

pt. 1, *Clay County Court v. Adams,* 109 W.Va. 421, 155 S.E. 174 (1930). In *West Virginia Department of Highways v. Sickles, supra,* we stated as follows: "Our law has long recognized the admissibility of a landowner's opinion concerning the value of his land." 161 W.Va. at 411, 242 S.E.2d at 570.

trial, Kyer had been in the real estate business for six or seven years, and Hefner was a loan officer in a bank. Both witnesses were familiar with the appellees' farm and during the trial discussed other properties in the area.[2] Neither witness, however, based his appraisal of the property in question upon the sales of comparable property. Specifically, Hefner testified that there was no property in the area that was, in fact, comparable to the appellees' property.

Kyer appraised the property of the appellees taken by the appellant at $1,707,420, with damage to the residue in the amount of $355,590. According to Kyer, therefore, the appellees were entitled to a total sum of $2,063,010 for the taking of their land. Hefner valued the property taken at $20,000 per acre for a total amount due the appellees of approximately, $1,600,000.

The appraisal witness for the appellant was Harold Wingate. Wingate had been a real estate appraiser for 25 years. Wingate had experience in appraising various tracts of land in Braxton County and first examined the appellees' land in 1967. As did the appellees, Wingate divided the appellees' property into various categories based upon the characteristics of that property. Upon the basis of those categories, Wingate assigned values per acre with respect to the property taken. Wingate concluded that $38,500 was fair and just compensation as of April 29, 1970, for the taking of the appellees' property by the appellant. Wingate further concluded that the construction of Interstate 79 resulted in an increase in value of the residue of the appellees' property beyond any damage sustained. Wingate stated during the trial that in arriving at the $38,500 figure, he considered sales of land in the area he believed to be comparable to the land of the appellees. Those sales included the sale of 84 acres in March, 1966, the sale of 57 acres in November, 1966, and the sale of 4.77 acres in August, 1966.

As the petition for appeal indicates, the appellant asks this Court to reverse the final order of the circuit court and grant a new trial. As a ground for relief, the appellant contends that many prospective jurors, from which the petit jury was selected, were personally acquainted in a social or business manner with the appellees and their witnesses. Therefore, the appellant contends that its motion to dismiss all 20 prospective jurors for cause and its motion for a change of venue should have been granted. The appellant contends that the jury was not fair and impartial and that the verdict for the appellees was excessive. The appellant further contends that certain instructions given by the circuit court were improper. The contentions of the appellant will be combined where appropriate for purposes of discussion.

The principal ground for relief asserted by the appellant before this Court concerns the 20 prospective jurors and the petit jury drawn from those prospective jurors. It is undisputed that many prospective jurors were personally acquainted with the appellees and their witnesses. That connection between the prospective jurors and the appellees was based upon the fact that appel-

---

2. In *Tennessee Gas Transmission Company v. Fox*, 134 W.Va. 106, 58 S.E.2d 584 (1950), the landowners, during an eminent domain trial, called two witnesses, Brady and Frazier, to testify with respect to the value of the property in question. In that action, Brady had had some experience in appraising real estate, and Frazier was acquainted with land values in the area. Although both Brady and Frazier had seen the property in question, neither witness knew of any real estate sales in the locality. 58 S.E.2d at 587. This Court held in *Tennessee Gas Transmission Company* that those witnesses were sufficiently qualified to testify upon behalf of the landowners concerning the property. Specifically, we held in syllabus points 1 and 2 in that case as follows:

1. A witness in a proceeding in eminent domain who is acquainted with the land involved, or who has recently visited and examined it and is familiar with the market value of other lands in the same locality, or who owns and has lived upon the land, is sufficiently qualified to give his opinion of its market value. The opinion evidence of a witness so qualified is admissible but its weight and its credibility are questions for the jury.

2. The determination of the qualifications of a witness to give his opinion of the market value of land involved in a proceeding in eminent domain rests in the sound discretion of the trial court, and such discretion, though subject to review, will not be disturbed unless its abuse is clearly shown.

lee, E. L. Fisher, was born in Braxton County and practiced medicine in that county in excess of 40 years. During the voir dire examination, testimony was elicited, for example, to the effect that Dr. Fisher treated the parents of one prospective juror, delivered another prospective juror at birth and delivered the children of a third prospective juror.

At the beginning of the trial of this action, a general voir dire examination was conducted in open court. Thereafter, an individual voir dire examination was conducted in chambers. The appellant's motion to dismiss all 20 prospective jurors for cause and the appellant's motion for a change of venue were denied.

As indicated by the statements of the prospective jurors made in open court and in chambers, nine prospective jurors were acquainted with the appellees. Ten of the prospective jurors, including six of those who knew the appellees, were acquainted with one or the other of the appellees' appraisal witnesses, Harry Kyer and Wallace Hefner. An analysis of all prospective jurors reveals that 13 prospective jurors out of 20 knew the appellees and/or certain witnesses for the appellees. *See* n. 3, *infra*. Furthermore, another appraisal witness for the appellees, Jack Butler, was not called to testify during the trial. Four of the prospective jurors, including those who were acquainted with the appellees or Harry Kyer or Wallace Hefner, were acquainted with Mr. Butler.[3]

**3.** The prospective jurors, numbered one through twenty for purposes of this discussion, testified as indicated below during the individual voir dire examinations in chambers. Prospective juror number one stated that, although it had been 10 years since she was treated by Dr. Fisher, Dr. Fisher was her parent's physician. Furthermore, that prospective juror owned cattle jointly with Wallace Hefner, an appraisal witness for the appellees. That prospective juror did not serve upon the petit jury. Prospective juror number two stated that she knew neither the appellees nor their appraisal witnesses. That prospective juror served upon the petit jury. Prospective juror number three stated that she was acquainted with appellee's appraisal witness, Wallace Hefner. Specifically, *that prospective juror conducted business at the bank at which Hefner was an employee.* That prospective juror did not know the appellees, and she did not serve upon the petit jury. Prospective juror number four stated that Dr. Fisher delivered him at birth. That prospective juror did not serve upon the petit jury. Prospective juror number five stated that she knew neither the appellees nor their appraisal witnesses. That prospective juror did not serve upon the petit jury.

Prospective juror number six stated that she knew Dr. Fisher because he had treated her son. Furthermore, she was somewhat acquainted with Jack Butler, an appraisal witness for the appellees who was not called to testify. That prospective juror served upon the petit jury. Prospective juror number seven was not acquainted with the appellees. That prospective juror, however, and Harry Kyer, an appraisal witness for the appellees, were members of the *same committee of a political party.* That prospective juror served upon the petit jury. Prospective juror number eight stated that, although she had not been treated by Dr. Fisher for twenty years, she had both a business and personal relationship with Wallace Hefner, an appraisal witness for the appellees. That prospective juror did not serve upon the petit jury. Prospective juror number nine stated that she had a doctor-patient relationship with Dr. Fisher and a business relationship with Harry Kyer, an appraisal witness for the appellees. That prospective juror served upon the petit jury. Prospective juror number ten stated that she was acquainted with Dr. Fisher and Harry Kyer, an appraisal witness for the appellees. Specifically, she indicated that Dr. Fisher was her family doctor. That prospective juror served upon the petit jury.

Prospective juror number eleven stated that she knew neither the appellees nor their appraisal witnesses. That prospective juror served upon the petit jury. Prospective juror number twelve indicated *that Dr. Fisher was his family* physician. Further, that prospective juror stated that he had a personal relationship with Wallace Hefner, an appraisal witness for the appellees, and Jack Butler, an appraisal witness for the appellees who was not called to testify. That prospective juror did not serve upon the petit jury. Prospective juror number thirteen stated that she had a doctor-patient relationship with Dr. Fisher and a business relationship with Harry Kyer, an appraisal witness for the appellees. That prospective juror served upon the petit jury. Prospective juror number fourteen stated that she once rented from Jack Butler, an appraisal witness for the appellees who was not called to testify. She did not know the appellees or their other appraisal witnesses. That prospective juror served upon the petit jury. Prospective juror number fifteen stated that he did not know the appellees. He was acquainted, however, with Wallace Hefner, an appraisal witness for the appellees, and Jack Butler, an appraisal witness for the appellees who was not called to testify. That prospective juror did not serve upon the petit jury.

Prospective juror number sixteen indicated that she did not know the appellees' appraisal

Subsequent to the voir dire examinations, the petit jury was selected. Six members of the jury were acquainted with the appellees and/or Mr. Kyer or Mr. Hefner. Another juror was acquainted with Mr. Butler. As indicated above, Mr. Butler did not testify.

The general standards concerning the qualifications of jurors, relating to such matters as whether the prospective juror has an interest in or bias toward a particular action, are provided by *W. Va. Code*, 56–6–12 [1931]. That statute states as follows:

Either party in any action or suit may, and the court shall on motion of such party, examine on oath any person who is called as a juror therein, to know whether he is a qualified juror, or is related to either party, or has any interest in the cause, or is sensible of any bias or prejudice therein; and the party objecting to the juror may introduce any other competent evidence in support of the objection; and if it shall appear to the court that such person is not a qualified juror or does not stand indifferent in the cause, another shall be called and placed in his stead for the trial of that cause. And in every case, unless it be otherwise specially provided by law, the plaintiff and defendant may each challenge four jurors peremptorily.

In eminent domain actions, members of the jury are required to be freeholders. *W. Va. Code*, 54–2–10 [1967].

■ In addition to that statute, standards concerning juror qualification have developed through case decision. In *State v. Hatfield*, 48 W.Va. 561, 37 S.E. 626 (1900), this Court held in syllabus point 1 as follows: "The object of the law is, in all cases in which juries are impaneled to try the issue, to secure men for that responsible duty whose minds are wholly free from bias or prejudice either for or against the accused, or for or against either party in civil cases." Similarly, in *State v. Wilson*, 157 W.Va. 1036, 207 S.E.2d 174 (1974), this Court held in syllabus point 1 as follows: "The true test as to whether a juror is qualified to serve on the panel is whether without bias or prejudice he can render a verdict solely on the evidence under the instructions of the court." Moreover, we have recognized that the mere statement of a prospective juror that he or she is not biased with respect to a particular cause may not be sufficient for the trial court to conclude that no such bias exists. As we stated in *State v. Pendry*, 159 W.Va. 738, 227 S.E.2d 210, 217 (1976), *overruled in part on other grounds, Jones v. Warden, West Virginia Penitentiary*, 161 W.Va. 168, 241 S.E.2d 914, 916–917 (1978):

It may not always be sufficient merely to ask a juror whether he is sensible of any bias or prejudice and to accept either his denial or claim of bias or prejudice merely because he says it. The existence of bias or prejudice or other lack of qualification is addressed in the first instance to the trial court. Although the juror's opinion is entitled to consideration, it need not always be taken to be conclusive. It may frequently become necessary for the trial court or counsel to go into particular matters which may be the subject of biased or prejudiced views in order to determine whether the juror in fact, even without his own knowledge, may have a demonstrable bias or prejudice which would operate to the disadvantage of one of the litigating parties.

■ Usually, the determination of whether a juror may be biased or prejudiced is left to the discretion of the trial

---

witnesses. However, she knew appellee, Anna Margaret Fisher, and she considered Dr. Fisher to be her family physician. Specifically, Dr. Fisher delivered her children at birth. That prospective juror served upon the petit jury. Prospective jurors number seventeen and eighteen knew neither the appellees nor their appraisal witnesses. Prospective jurors number seventeen and eighteen served upon the petit

jury. Prospective juror number nineteen stated that, although he did not know Dr. Fisher, he was acquainted with Harry Kyer, an appraisal witness for the appellees. That prospective juror did not serve upon the petit jury. Prospective juror number twenty knew neither the appellees nor their appraisal witnesses. That prospective juror served upon the petit jury.

judge. *State v. Gargiliana*, 138 W.Va. 376, 379, 76 S.E.2d 265, 267 (1953).[4]

In *Chesapeake & Ohio Railway Co. v. Smith*, 103 Va. 326, 49 S.E. 487 (1905), the Supreme Court of Appeals of Virginia affirmed a judgment in favor of the plaintiff in a personal injury action filed against a railway company. The record in that action indicated that certain jurors were friends of the plaintiff and that the plaintiff was their family physician. The Virginia court nevertheless found those jurors to be qualified and in syllabus point 1 held as follows:

> The fact that jurors in a civil case are friends of the plaintiff, and that he is their family physician, does not *per se* disqualify them from sitting in the case. The trial court must determine from all the facts before it whether or not a juror is competent. In the absence of other evidence, his statement on his *voir dire* that the relation would not influence his verdict is sufficient to warrant his acceptance.

103 Va. 326, 49 S.E. 487.

In *Chesapeake & Ohio Railway Co.*, however, the court noted as follows: "The juror may state and honestly believe that he is free from all bias, and yet it may appear from his own or from extraneous evidence, or both, that such may not be the fact." 103 Va. at 328, 49 S.E. at 487.

In *Lambert v. Sisters of St. Joseph of Peace*, 277 Or. 223, 560 P.2d 262 (1977), the plaintiffs, alleging negligent medical treat-

ment, brought an action against a physician and others. A verdict in favor of the defendants was returned by the jury. One of the jurors, Bruce C. Brandt, had been treated by defendant physician, Dr. Degge. On voir dire, Brandt testified that he thought Dr. Degge was a good physician and that it might be hard to convince Brandt to return a verdict against Dr. Degge. On the other hand, Brandt testified that there was no reason why he could not act as a fair and impartial juror.[5]

In *Lambert*, the Court concluded that there was a substantial probability of bias on the part of juror Brandt, and, therefore, the trial court's denial of the plaintiffs' challenge for cause with respect to Brandt was a manifest abuse of discretion. Accordingly, the action was remanded to the trial court for a new trial.

In *Lambert*, the court stated as follows:

> It is not enough if a juror believes that he can be impartial and fair. The court in exercising discretion must find from all of the facts that the juror will be impartial and fair and not be biased consciously or subconsciously. A mere statement by the juror that he will be fair and afford the parties a fair trial becomes less meaningful in light of other testimony and facts which at least suggest the probability of bias. The court in exercising discretion must be convinced that a probability of bias of the juror does not exist. The test of a juror's

---

**4.** As this Court stated in *State v. Gargiliana, supra*:

> The determination of the qualifications of a juror is a problem often difficult to solve. The fact sought to be established, whether the juror may be biased or prejudiced, rests alone with the proposed juror, and often he may be unable to honestly determine whether he would be unduly influenced by certain facts or situations in consideration of evidence to be offered. Usually the answer is left to the sound discretion of the trial judge. (Citations omitted)

138 W.Va. at 379, 76 S.E.2d at 267.

**5.** In *Lambert, supra*, juror Brandt on voir dire testified in part as follows:

> THE COURT: Now, is there anything about that relationship that you think might affect your thinking?

> JUROR BRANDT: Well, I, I think Dr. Degge is a very good doctor, but as far as that, you know, that would, that would bother me.

> THE COURT: Well, let me ask you this: Would you give any more credence to Dr. Degge's testimony than you would to any other witness.

> JUROR BRANDT: I don't, I don't believe I would.

> \* \* \* \* \* \*

> THE COURT: Any reason you can think of that you could not act as a fair and impartial juror?

> JUROR BRANDT: No.

> \* \* \* \* \* \*

> A. [Juror Brandt]—you might have a harder time convincing me because I have had this association [with the doctor].

560 P.2d at 264–265.

disqualification is the probability of bias or prejudice as determined by the court. 560 P.2d at 266.

In the action before this Court, 13 prospective jurors were acquainted with the appellees and/or their appraisal witnesses, Kyer or Hefner. The appellant, by way of peremptory challenges, could only remove four of those 13 jurors. The petit jury selected from those prospective jurors contained six members who were acquainted with the appellees and/or witnesses Kyer or Hefner. We are not unmindful of the fact that Dr. Fisher had practiced medicine in the area in excess of 40 years and that it would be difficult in a rural county such as Braxton County to secure prospective jurors not acquainted with such a landowner or other witnesses. We hold, however, that the circuit court abused its discretion in failing to grant the appellant's motion to dismiss for cause all 20 prospective jurors. The number of prospective jurors who knew the appellees or their witnesses, or both, was substantial, and, although all prospective jurors stated that they could deliberate fairly upon the action, we are of the opinion that the appellant proceeded to trial at a serious disadvantage.

Several prospective jurors had at one time or continued to have Dr. Fisher as their personal or family physician. The physician-patient relationship is a special relationship. Inherent in that relationship is a respect for the reliability of statements communicated between the physician and the patient. *See Sutherland v. Kroger Company*, 144 W.Va. 673, 110 S.E.2d 716 (1959).[6] That mutual reliability or trust ordinarily grows as the physician-patient relationship continues.

 In an eminent domain action, such as the one before this Court, opinion testimony is often the primary consideration. We are of the opinion that where a physician is a party in such a proceeding, and several prospective jurors and members of the petit jury are or were his patients, the possibility that the action cannot be resolved without prejudice should be recognized. We hold, therefore, that where a physician-patient relationship exists between a party to litigation and a prospective juror, although such prospective juror is not disqualified *per se*, special care should be taken by the trial judge to ascertain, pursuant to *W.Va.Code*, 56–6–12 [1931], that such prospective juror is free from bias or prejudice. Specifically, we hold that in an eminent domain action, although all prospective jurors stated that they could return a verdict free from bias or prejudice, where the record indicates that 13 prospective jurors were acquainted with the landowners and/or their appraisal witnesses, which witnesses testified at trial, and, of the petit jury selected from those prospective jurors, six jurors were acquainted with the landowners and/or such appraisal witnesses, a likelihood of bias or prejudice on the part of the jury existed sufficient to require that the verdict of the jury be set aside and a new trial awarded.

We find no reversible error in this action with respect to the instructions challenged by the appellant in this appeal, and all other errors asserted by the appellant are without merit.

The final order of the Circuit Court of Braxton County is hereby reversed, and this action is remanded to the circuit court for a new trial.

Reversed and remanded.

---

6. In *Sutherland v. Kroger Company, supra,* this Court recognized the probable reliability of the statements of a patient to his physician. In syllabus point 8 we held as follows: "It is a well recognized exception to the hearsay rule that a doctor who examines a patient for the purpose of treatment may testify as to his medical conclusions, which may be based on the history given to him by the patient with regard to subjective symptoms."