IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2008 Term

_____

No. 33525

_____

**FILED**

**November 6, 2008**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

ROBERT MACEK AND LAWRENCE MACEK,
INDIVIDUALLY AND AS CO-EXECUTORS OF
THE ESTATE OF PHYLLIS MACEK,
Plaintiffs Below, Appellants

v.

CARL R. JONES, D.O., AND
WEIRTON MEDICAL CENTER, INC.,
A WEST VIRGINIA CORPORATION,
Defendants Below, Appellees

_____

Appeal from the Circuit Court of Brooke County
The Honorable Martin J. Gaughan, Judge
Case No. 01-C-238

AFFIRMED

_____

Submitted: September 3, 2008
Filed: November 6, 2008

Scott S. Blass
Geoffrey C. Brown
Bordas & Bordas, PLLC
Wheeling, West Virginia
Counsel for the Appellants

Stephen R. Brooks
Robert C. James
Flaherty, Sensabaugh & Bonasso, PLLC
Wheeling, West Virginia
Counsel for the Appellee,
 Carl R. Jones, D.O.

Brent P. Copenhaver
Colombo & Stuhr, PLLC
Morgantown, West Virginia
Counsel for the Appellee,
 Weirton Medical Center, Inc.

The Opinion of the Court was delivered PER CURIAM.

JUSTICE ALBRIGHT not participating.

SENIOR STATUS JUSTICE McHUGH sitting by temporary assignment.

SYLLABUS BY THE COURT

1. "Although the ruling of a trial court in granting or denying a motion for a new trial is entitled to great respect and weight, the trial court's ruling will be reversed on appeal when it is clear that the trial court has acted under some misapprehension of the law or the evidence." Syl. Pt. 4, *Sanders v. Georgia-Pacific Corp.*, 159 W.Va. 621, 225 S.E.2d 218 (1976).

2. "We review the final order and the ultimate disposition under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a *de novo* review." Syl. Pt. 2, in part, *Walker v. West Virginia Ethics Comm'n*, 201 W.Va. 108, 492 S.E.2d 167 (1997).

3. "When considering whether to excuse a prospective juror for cause, a trial court is required to consider the totality of the circumstances and grounds relating to a potential request to excuse a prospective juror, to make a full inquiry to examine those circumstances and to resolve any doubts in favor of excusing the juror." Syl. Pt. 3, *O'Dell v. Miller*, 211 W.Va. 285, 565 S.E.2d 407 (2002).

4. "If a prospective juror makes an inconclusive or vague statement during *voir dire* reflecting or indicating the possibility of a disqualifying bias or prejudice, further

i

probing into the facts and background related to such bias or prejudice is required." Syl. Pt. 4, *O'Dell v. Miller*, 211 W.Va. 285, 565 S.E.2d 407 (2002).

5. "Once a prospective juror has made a clear statement during voir dire reflecting or indicating the presence of a disqualifying prejudice or bias, the prospective juror is disqualified as a matter of law and cannot be rehabilitated by subsequent questioning, later retractions, or promises to be fair." Syl. Pt. 5, *O'Dell v. Miller*, 211 W.Va. 285, 565 S.E.2d 407 (2002).

Per Curiam:[1]

This case is before this Court upon appeal by Robert and Lawrence Macek, as administrators of the Estate of Phyllis Macek (hereinafter "Appellants") from a final order of the Circuit Court of Brooke County denying post-trial relief subsequent to a defense verdict in this medical malpractice action. The Appellants contend that the lower court erred in failing to strike two potential jurors for cause. Subsequent to a six-day trial, the jury returned a unanimous verdict in favor of the Appellees, Weirton Medical Center and Dr. Carl R. Jones, (hereinafter "Appellees"). Upon review of the parties' arguments, the record, and the pertinent authorities, we affirm the trial court's rulings.

I. Factual and Procedural History

On February 21, 2000, Mrs. Phyllis Macek presented to the Emergency Department at Weirton Medical Center, suffering from rectal bleeding. Mrs. Macek was evaluated by an emergency medicine specialist, Dr. Edmundo Mandac. Subsequent to a series of tests, Dr. Mandac contacted Mrs. Macek's private physician, Gary Hanson, M.D., and Dr. Hanson thereafter ordered that Mrs. Macek be admitted to Weirton Medical Center.

---

[1]Pursuant to an administrative order entered on September 11, 2008, the Honorable Thomas E. McHugh, Senior Status Justice, was assigned to sit as a member of the Supreme Court of Appeals of West Virginia commencing September 12, 2008, and continuing until the Chief Justice determines that assistance is no longer necessary, in light of the illness of Justice Joseph P. Albright.

1

Dr. Hanson also ordered a consultation with Appellee Dr. Carl Jones, a gastroenterologist with staff privileges at Weirton Medical Center.

Dr. Jones evaluated Mrs. Macek and scheduled her for a colonoscopy to be performed the following day. By the morning of February 22, 2000, blood tests revealed that Mrs. Macek had lost blood during the night of February 21, 2000. Dr. Jones consequently ordered two pints of blood to be transfused and thereafter proceeded with the colonoscopy. During that procedure, it was discovered that Mrs. Macek had suffered a bowel perforation, and Dr. Jones terminated the colonoscopy. He transferred Mrs. Macek to the critical care unit and scheduled her for an exploratory laparotomy, after which she developed disseminated intravascular coagulopathy and died.

The Appellants brought a medical professional liability claim against Dr. Jones and Weirton Medical Center for alleged violations of the applicable standard of care and wrongful death. The Appellants contend that Dr. Jones perforated Mrs. Macek's colon during the course of the colonoscopy and that Mrs. Macek had not received sufficient blood prior to the initiation of that procedure. The Appellants further contend that Weirton Medical Center is vicariously liable for the conduct of Dr. Jones.

The case proceeded to trial in June 2006. At the request of Appellants' counsel, the trial court directed the prospective jurors to complete a "Special Jury

Questionnaire" drafted by Appellants' counsel. Subsequent to the jurors' completion of the questionnaire, additional questioning of many of the prospective jurors occurred in the trial court's chambers. During such questioning, the trial court struck several prospective jurors for cause. The Appellants contend that the trial court erred in failing to strike prospective jurors David Andrew George and Glen Stolburg for cause.

Regarding the alleged bias of prospective juror Mr. David George, the Appellants claim that Mr. George was conspicuously biased toward Dr. Jones and that such bias was revealed through his answers to several questions. Question Number Four, for instance, presented the following question to Mr. George: "Can you state that if, after you have heard all of the evidence in this case, you find that the defendant, Dr. Jones, was negligent, you will return a verdict against Dr. Jones?" Mr. George answered: "If I believe that if his guilt is proven beyond a reasonable doubt, I would probably have no choice." When subsequently asked to explain his answer to that question, Mr. George stated, "Well I – maybe part of my philosophy is I try to be as objective as I can possibly be, because I know that the defendant, you know, he's facing something very serious." He continued, "I tend to be kind of sympathetic with people at the same time and – but there could be a good chance I'd say he's guilty [referring to Dr. Jones] too." Mr. George also explained that he did not "see any difficulties in reaching an impartial and unbiased verdict. . . ."

3

The Appellants also emphasize Mr. George's apparent identification with physicians who had been subjected to medical malpractice claims. For instance, Mr. George was asked, "Have you read, heard or discussed anything about medical negligence actions, lawsuits or a liability crisis?" He answered, "I heard of a doctor in Wheeling who lost a million dollar negligence suit for refusing to listen to the daughter of a patient who was ordered to go home and died there that night." Mr. George later explained that he personally knew the physician who was involved in the case he referenced in his written response. Mr. George stated that he had "sympathy for him" and explained that "[i]t kind of stays with me." He acknowledged that while he tried to be fair, the incident "had some kind of effect on me simply because I knew [the physician]." He further stated that he "couldn't just wipe it clean from [his] memory." Mr. George also explained that his brother, Ned George, was a Wheeling attorney who represents employers in civil litigation.

In response to another question concerning whether he had formed an opinion regarding medical negligence actions, Mr. George answered: "I sometimes can't help but think that some lawyers take advantage of what become frivolous cases and the premiums doctors have to pay skyrocket and it drives some of them out of the state. On the other hand, I try to be objective about them as well." In response to another question regarding medical malpractice claims, Mr. George stated, "I will admit that I suspect there can be greed involved with the plaintiffs. However, some do have legitimate cases that stick." When asked whether negligence actions had interrupted the quality of care or increased costs, Mr.

4

George wrote, "I think it has because of a doctor in Weirton who had to refer me to an interim [doctor] because she was trying to reassess what she was going to do because of the malpractice [situation]. Mr. George later explained that "there could be lots of doctors who leave the state because they have to pay so much for their premiums." He also stated that he was "sympathetic with [his own doctor] because . . . it's been kind of difficult for her."

With respect to prospective juror Glen Stolburg, the Appellants contend that Mr. Stolburg failed to accurately portray his exposure and understanding of his employer's stance on medical malpractice litigation. Mr. Stolberg was employed as a district sales manager for Ogden Publishing. The Appellants maintain that Ogden Publishing's coverage of medical malpractice litigation had been extensive.[2] The Appellants contend that Mr. Stolburg was untruthful in his response to a question regarding whether he had read, heard, or discussed anything about medical malpractice litigation. Mr. Stolburg had simply replied, "no." Further questioning, however, revealed that Mr. Stolburg was indeed aware of Ogden Publishing's coverage of medical malpractice issues. "I know it carried some coverage. . . well, I know it was on the front page a few times," Mr. Stolburg stated. He also revealed that

---

[2]The Appellants' Brief explains: "It goes without saying that Ogden's publishing concerns have been extraordinarily vocal and biased in their coverage of the malpractice 'crisis.' This Court is well aware of the organized effort by physicians and major media outlets in the Northern Panhandle to saturate potential jurors with news stories, fliers, billboards, etc., documenting a so-called 'crisis.'"

he was aware of a strike by Wheeling area physicians, their discontent with insurance premiums, and their desire to seek a cap on damages.

Upon the trial court's refusal to strike either Mr. George or Mr. Stolburg for cause, the Appellants utilized their peremptory strikes to remove both of those prospective jurors. Thus, neither Mr. George nor Mr. Stolburg served on the jury that was ultimately selected and utilized at trial. The trial concluded on June 12, 2006, with a unanimous verdict in favor of the Appellees. Based upon its finding of absence of liability by Dr. Jones, the jury did not reach the question of the vicarious liability of Weirton Medical Center. The Appellants' motion for a new trial, based upon the trial court's refusal to strike the two potential jurors during jury selection,[3] was denied by the trial court, and this appeal followed.

## II. Standard of Review

With respect to a trial court's denial of a motion for a new trial, this Court has held as follows: "Although the ruling of a trial court in granting or denying a motion for a new trial is entitled to great respect and weight, the trial court's ruling will be reversed on appeal when it is clear that the trial court has acted under some misapprehension of the law

---

[3]The Appellants allege that the trial court's failure to strike Mr. George and Mr. Stolburg resulted in substantial prejudice since they were "effectively deprived of their peremptories because they were forced to use them in lieu of their strikes for cause." The Appellants contend that as a result, they "had no peremptories left to strike juror Carole DiNardo, a phlebotomist at an area hospital who worked with the defendant, Dr. Jones."

or the evidence." Syl. Pt. 4, *Sanders v. Georgia-Pacific Corp.*, 159 W.Va. 621, 225 S.E.2d 218 (1976). Generally, appellate review of a trial court's rulings requires this Court to apply a two-prong deferential standard of review. *See Doe v. Wal-Mart Stores, Inc.*, 210 W.Va. 664, 558 S.E.2d 663 (2001). "We review the final order and the ultimate disposition under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a *de novo* review." Syl. Pt. 2, in part, *Walker v. West Virginia Ethics Comm'n*, 201 W.Va. 108, 492 S.E.2d 167 (1997).

With specific reference to the underlying question of whether a particular potential juror should be excused to avoid bias or prejudice in the jury panel, this Court has stated that the decision is typically within the sound discretion of the trial judge. *See West Virginia Dept. of Highways v. Fisher*, 170 W.Va. 7, 289 S.E.2d 213 (1982) *cert. denied*, *Fisher v. West Virginia Dept. of Highways*, 459 U.S. 944 (1982). This Court has consistently explained that we "defer to a trial judge's ruling regarding the qualifications of jurors because the trial judge is able to personally observe the juror's demeanor, assess his/her credibility, and inquire further to determine the juror's bias and/or prejudice." *Black v. CSX Transp. Inc.*, 220 W. Va. 623, 627, 648 S.E.2d 610, 614 (2007).

III. Discussion

7

West Virginia Code § 56-6-12 (1923) (Repl. Vol. 2005) entitles parties to a civil action to impartial jurors, specifically providing as follows:

> Either party in any action or suit may, and the court shall on motion of such party, examine on oath any person who is called as a juror therein, to know whether he is a qualified juror, or is related to either party, or has any interest in the cause, or is sensible of any bias or prejudice therein; and the party objecting to the juror may introduce any other competent evidence in support of the objection; and if it shall appear to the court that such person is not a qualified juror or does not stand indifferent in the cause, another shall be called and placed in his stead for the trial of that cause.

This Court explained in *O'Dell v. Miller*, 211 W.Va. 285, 565 S.E.2d 407 (2002), that the "object of jury selection is to secure jurors who are not only free from improper prejudice and bias,[4] but who are also free from the suspicion of improper prejudice or bias." 211 W. Va. at 288, 565 S.E.2d at 410. The *O'Dell* Court further commented upon voir dire as a tool capable of "ferret[ing] out biases and prejudices to create a jury panel, before the exercise

---

[4]This Court has explained that "[a]ctual bias can be shown either by a juror's own admission of bias or by proof of specific facts which show the juror has such prejudice or connection with the parties at trial that bias is presumed." Syl. Pt. 5, *State v. Miller*, 197 W.Va. 588, 476 S.E.2d 535 (1996).

> Bias, in its usual meaning, is an inclination toward one side of an issue rather than to the other, but to disqualify, it must appear that the state of mind of the juror leads to the natural inference that he will not or did not act with impartiality. Prejudice is more easily defined, for it means prejudgment and consequently embraces bias; the converse is not true.

*Compton v. Henrie*, 364 S.W.2d 179, 182 (Tex. 1963).

of peremptory strikes, free of the taint of reasonably suspected prejudice or bias." *Id.*, 565

S.E.2d at 410.

In *Fisher*, this Court addressed the methodology to be utilized by a trial court

in determining whether removal is necessary, explaining as follows:

> "It is not enough if a juror believes that he can be impartial and fair. The court in exercising [its] discretion must find from all of the facts that the juror will be impartial and fair and not be biased consciously or subconsciously. A mere statement by the juror that he will be fair and afford the parties a fair trial becomes less meaningful in light of other testimony and facts which at least suggest the probability of bias. The court in exercising discretion must be convinced that a probability of bias of the juror does not exist. The test of a juror's disqualification is the probability of bias or prejudice as determined by the court."

170 W. Va. at 12-13, 289 S.E.2d at 219 (quoting *Lambert v. Sisters of St. Joseph of Peace*,

560 P.2d 262 (Or. 1977)).

Elaborating upon that concept, this Court concluded as follows in syllabus

point three of *O'Dell:* "When considering whether to excuse a prospective juror for cause,

a trial court is required to consider the totality of the circumstances and grounds relating to

a potential request to excuse a prospective juror, to make a full inquiry to examine those

circumstances and to resolve any doubts in favor of excusing the juror." The *O'Dell* Court

continued: "When considering whether a prospective juror is prejudiced or biased, the trial

court must consider all the circumstances surrounding the juror. The trial court must not only consider the prospective juror's promise to be fair but all of the circumstances at issue." 211 W. Va. at 289, 565 S.E.2d at 411.

Moreover, this Court is also profoundly aware of the temptation of a trial court to seek to "rehabilitate"[5] a juror who has provided a questionable response. In attempting to curtail such practice, this Court enunciated what it described as the "better view" in *O'Dell.* 211 W. Va. at 290, 565 S.E.2d at 412. Syllabus point four of *O'Dell* instructs: "If a prospective juror makes an inconclusive or vague statement during *voir dire* reflecting or indicating the possibility of a disqualifying bias or prejudice, further probing into the facts and background related to such bias or prejudice is required." However, it is imperative that a prospective juror who makes a clear statement indicating a prejudice or bias be removed from the jury without the necessity of further probing. In that vein, syllabus point five of *O'Dell* states*:* "Once a prospective juror has made a clear statement during voir dire reflecting or indicating the presence of a disqualifying prejudice or bias, the prospective juror is disqualified as a matter of law and cannot be rehabilitated by subsequent questioning, later retractions, or promises to be fair."

_____

[5]Rehabilitation is "[the] commonly accepted terminology to describe the questioning of a juror who has made a statement indicating bias or prejudice. It is an inaccurate term, suggesting a goal of getting a juror to change the biased attitude. The questioning should actually be for the purpose of clarification or elaboration." Daniel J. Sheehan, Jr., and Jill C. Adler, *Voir Dire: Knowledge Is Power*, 61 Tex. B.J. 630, 633 (1998).

10

The *O'Dell* paradigm was applied in *Thomas v. Makani,* 218 W.Va. 235, 624 S.E.2d 582 (2005), a medical malpractice action in which a patient alleged that a physician violated the applicable standard of care. The plaintiff appealed a defense verdict, contending that the circuit court abused its discretion by refusing to strike potential jurors who had previously received successful medical treatment from the defendant physician. This Court engaged in the *O'Dell* analysis and concluded that the trial court did not err in failing to strike the juror for cause.[6] The potential juror had initially indicated that he might possibly "lean toward" the defendant physician. 218 W.Va. at 238, 624 S.E.2d at 585. This Court was "unable to conclude that Juror Evans made a clear statement of disqualifying bias toward Dr. Makani sufficient to disqualify him from serving on the jury." *Id*. at 238, 624 S.E.2d at 585. While this Court found that the "initial comments required further inquiry by the court[,]" this Court observed that the potential juror had "explained that since he had no medical knowledge, he would more likely believe the doctor who presented the most credible and convincing evidence. He clearly stated that he would not find in favor of Dr. Makani simply because he had treated him fourteen years ago." *Id*. at 238-39, 624 S.E.2d at 585-86. This Court concluded as follows in *Thomas*:

> After reviewing the record in this case, we conclude that the trial court took "special care" to determine that Juror Evans was free from bias and prejudice. The trial court clearly

---

[6]The plaintiff in *Thomas* did not move to strike two of the jurors for cause. This Court consequently found that the plaintiff had "waived her right to allege error in this appeal with respect to these two jurors." 218 W.Va. at 239, 624 S.E.2d at 586.

11

considered the totality of the circumstances and conducted a full inquiry before determining that there was no basis to disqualify Juror Evans from serving on the jury.

*Id*. at 239, 624 S.E.2d at 586.

Similarly, in *Black v. CSX Transportation, Inc*. 220 W.Va. 623, 648 S.E.2d 610 (2007), this Court applied the *O'Dell* standards and found that a physician should have been excused as a potential juror for cause due to his clearly expressed bias against personal injury lawyers, asbestos litigation, and awards based on "anything other than pure objective science." 220 W.Va. at 629, 648 S.E.2d at 616. The *Black* Court explained:

Dr. Polack clearly expressed a bias against Mrs. Black. Despite his statements that he would render a decision based upon the scientific evidence presented and the trial court's instructions of law, Dr. Polack continued to convey a bias against parties claiming to have been injured by exposure to asbestos and against personal injury attorneys."

*Id*. at 629, 648 S.E.2d at 616.

In the case sub judice, the Appellees contend that neither challenged juror made a *clear* statement of prejudice or bias in favor of Dr. Jones or the medical center. Thus, the Appellees contend that the trial court was justified in complying with the requirements of *O'Dell* by further interrogating the potential jurors to ascertain their capacity to render a fair verdict. By engaging in such process of additional inquiry, the trial court utilized "special

12

care" to ascertain whether the jurors had a disqualifying bias or prejudice. *Thomas,* 218 W. Va. at 239, 624 S.E.2d at 586.

During such additional inquiry, the potential jurors each explained their initial statements and responded to further questions. Juror George specifically indicated that he would be persuaded by the evidence itself and the manner in which it was presented. In its order, the trial court acknowledged the precedent regarding consideration of the totality of the circumstances and the unique vantage point of a trial judge. The trial court identified seven specific instances in which Mr. George clearly indicated that he would be a fair and impartial juror.[7] With regard to Mr. George's inaccurate use of the phrase "beyond a reasonable doubt" as applicable to a civil action , the trial court explained that "Mr. George's incorrect assumption of the standard of proof in a civil medical malpractice case, as opposed to a criminal case, is very common among prospective jurors and does not readily indicate a bias." The trial court noted that once Mr. George was properly instructed on the standard of proof, he stated unequivocally that he would follow the trial court's instructions. The trial court found that Mr. George's answers, when "taken together," revealed an unprejudiced

---

[7]These seven instances referred particularly to Mr. George's stated ability to remain objective, the absence of any impartiality, and his ability to keep an open mind. With regard to a doctor who had a medical malpractice action brought against him, Mr. George explained: "So what I'm getting at is, you know, because of what I acknowledge as far as good and maybe not so good in this doctor, it didn't necessarily make me become biased against either the doctors or the plaintiffs or whatnot." Mr. George also stated that he had "never been directly affected by something like this or been involved with this."

potential juror willing to follow the trial court's directives. The trial court concluded that "[t]here is nothing in the record to indicate that Mr. George was rehabilitated to make statements that he will be fair and impartial."

Likewise, the trial court examined Mr. Stolburg's testimony, finding that Mr. Stolburg's employment position requires him to oversee the delivery of newspapers at Ogden Publishing. Mr. Stolburg is not involved with the sale or editing of the paper. The trial court found no reason to disbelieve Mr. Stolburg's statement that he personally does not read the paper often and that he has not formed any opinions regarding medical malpractice actions which would have prohibited him from serving as a juror in this case.[8]

Upon this Court's independent examination of the transcript of the voir dire proceedings in this case, we are unable to conclude that either Juror George or Juror Stolburg made a clear statement of disqualifying bias toward Dr. Jones or Weirton Medical Center sufficient to disqualify him from serving on the jury. While we believe that the trial court was correct to conclude that the jurors' initial comments compelled further inquiry by the trial court, we find that such additional questioning revealed that each of these potential jurors was free from disqualifying bias or prejudice. The trial court competently considered

---

[8]The trial court found that "the conclusion that Mr. Stolburg was in some way untruthful in a veiled effort to get picked for the jury in a medical malpractice case just to sabotage that case is absurd."

14

the totality of the circumstances and conducted a comprehensive inquiry before determining that the jurors were competent to serve.

## IV. Conclusion

Accordingly, for the reasons set forth above, the final order of the Circuit Court of Brooke County is affirmed.

Affirmed.