IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2023 Term

_____

No. 21-0845

_____

FILED

June 14, 2023

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

WEST VIRGINIA LAND RESOURCES, INC., and
MARION COUNTY COAL RESOURCES, INC.,
Petitioners,

v.

AMERICAN BITUMINOUS POWER PARTNERS, LP,
WEST VIRGINIA DEPARTMENT OF ENVIRONMENTAL PROTECTION, and
WEST VIRGINIA ENVIRONMENTAL QUALITY BOARD,
Respondents.

AND

_____

Nos. 21-0885 and 21-0893

_____

AMERICAN BITUMINOUS POWER PARTNERS, L.P.,
a Delaware limited partnership,
Petitioner,

v.

WEST VIRGINIA LAND RESOURCES, INC.,
MARION COUNTY COAL RESOURCES, INC., and
WEST VIRGINIA ENVIRONMENTAL QUALITY BOARD,
Respondents.

_____

Appeals from the West Virginia Environmental Quality Board,
Appeal No. 20-07-EQB

AFFIRMED

_____

Submitted: January 11, 2023
Filed: June 14, 2023

Christopher B. Power, Esq.
Robert M. Stonestreet, Esq.
Babst Calland Clements and Zomnir, PC
Charleston, West Virginia
Counsel for West Virginia Land
Resources, Inc., and Marion County Coal
Resources, Inc.

Roberta F. Green, Esq.
Christopher D. Negley, Esq.
Shuman McCuskey Slicer PLLC
Charleston, West Virginia
Counsel for American Bituminous Power
Partners, LP

Jeffrey O. Dye, II, Esq.
Office of Legal Services
Charleston, West Virginia
Counsel for Respondent West Virginia
Department of Environmental Protection

JUSTICE HUTCHISON delivered the Opinion of the Court.

JUSTICE BUNN, deeming herself disqualified, did not participate in the Decision of the Court.

JUDGE MARYCLAIRE AKERS, sitting by temporary assignment.

**SYLLABUS BY THE COURT**

1.	West Virginia Code § 22B-1-9(a) (2018) requires a court to review an order of the Environmental Quality Board pursuant to the provisions of West Virginia Code § 29A-5-4(g) (2021) of the West Virginia Administrative Procedures Act.  Under the Act, a court reviewing an order by the Environmental Quality Board may affirm the order or may remand the case for further proceedings.  However, the court must reverse, vacate or modify the order or decision of the Board if the substantial rights of the petitioner or petitioners have been prejudiced because the Board's findings, inferences, conclusions, decisions and/or order are: (1) In violation of constitutional or statutory provisions; (2) In excess of the statutory authority or jurisdiction of the agency; (3) Made upon unlawful procedures; (4) Affected by other error of law; (5) Clearly wrong in view of the reliable, probative, and substantial evidence on the whole record; or (6) Arbitrary or capricious or characterized by an abuse of discretion or a clearly unwarranted exercise of discretion.

2.	"The 'clearly wrong' and the 'arbitrary and capricious' standards of review are deferential ones which presume an agency's actions are valid as long as the decision is supported by substantial evidence or by a rational basis."  Syl. Pt. 3, *In re Queen*, 196 W. Va. 442, 473 S.E.2d 483 (1996).

3.	"In the absence of any definition of the intended meaning of words or terms used in a legislative enactment, they will, in the interpretation of the act, be given their common, ordinary and accepted meaning in the connection in which they are used."

i

Syl. Pt. 1, *Miners in General Group v. Hix*, 123 W.Va. 637, 17 S.E.2d 810 (1941), *overruled, in part, on other grounds by Lee–Norse Co. v. Rutledge*, 170 W.Va. 162, 291 S.E.2d 477 (1982).

4.    Under West Virginia Code § 22-11-21 (1994), a person is "adversely affected" by a decision or "aggrieved" by the terms or conditions of a permit when the person shows some legal right or interest that is influenced, by either the decision or the terms and conditions of the permit, in an articulable way that is harmful or contrary to the person's right or interest.

HUTCHISON, Justice:

This appeal concerns an "Underground Injection Control Permit" issued to American Bituminous Power Partners, L.P. ("Ambit") that allows Ambit to pump or "inject" acid mine drainage into an abandoned underground mine. Several subsidiaries of a mining company, American Consolidated Natural Resources, Inc. ("ACNR"), challenged the permit because those subsidiaries would eventually have to pump that drainage out of the nearby mines that they operate and treat it at their own expense.

The Environmental Quality Board ("the EQB") considered the challenge by ACNR's subsidiaries and issued a decision which modified Ambit's permit and reduced the amount of drainage that Ambit was allowed to inject into the abandoned mine. Ambit and ACNR both appeal that decision. After our review of the record, we conclude that the EQB acted within its discretion when it modified the permit. Accordingly, as we discuss below, we affirm the EQB's decision.

## I. Factual and Procedural Background

### A. The Conflict Between the Parties

Ambit operates a small electricity-generating plant in Marion County, West Virginia that is designed to burn "waste coal." Waste coal consists of lower quality coal mixed with rock and dirt that mining companies separated from the marketable "clean coal" sold to customers. During the last century, waste coal was dumped in mounds (called "gob

1

piles") that now sit on the surface around abandoned underground coal mines. The Ambit plant was developed to consume the waste coal from abandoned mine sites near its plant.

Ambit has a long-term lease to a parcel of land in Marion County,[1] about 80 acres in size, that overlies the abandoned Joanne Mine. When Ambit signed the lease, it intended to fuel its plant with the gob piles of waste coal scattered on the surface of the Joanne parcel. However, because of the high ash and sulfur content of the waste coal, Ambit later learned it would be unable to use it as fuel.

Unfortunately for Ambit, rain, snow, and surface water percolates through the gob piles on the Joanne parcel. Through chemical reactions, the water becomes highly acidic and rich in heavy metals, and it takes on a new title: acid mine drainage (or "AMD").[2] Ambit's lease requires it to control the AMD created on the Joanne parcel. Ambit's solution is to collect and then inject the untreated AMD down a well bore and into the voids of the abandoned Joanne Mine beneath the parcel.

---

[1] Ambit leases the Joanne parcel from Horizon Ventures. *See Horizon Ventures of W. Va., Inc. v. Am. Bituminous Power Partners, L.P.*, 246 W. Va. 374, 873 S.E.2d 905 (2022) (discussing how Ambit's rent is calculated according to whether Ambit's power plant is fueled with waste coal on certain lands leased from Horizon Ventures or fueled with coal from other sources).

[2] On the permit application at issue in this case, Ambit stated that water samples at the Joanne parcel "display AMD characteristics including elevated readings of iron, manganese, conductivity and total dissolved solids."

2

The Joanne Mine is part of a large network of interconnected, mined-out voids beneath Marion County. These voids, carved through the Pittsburgh coal seam in years past by coal miners, are known as the "Fairmont Mine Pool." As the name suggests, the mined-out tunnels in the Fairmont Mine Pool are partially or completely flooded with water that mostly drains in from above, and which weeps, seeps and flows from one mine to the next (and, again, through chemical reactions becomes AMD). On the permit application at issue in this case, Ambit claimed the AMD it injects into the Joanne Mine flows east and through the abandoned, mined-out voids of the Bethlehem No. 44 Mine, then through the Bethlehem No. 41 and the Dakota Mines, before arriving at the Jordan Mine. To maintain the water level throughout the Fairmont Mine Pool (partly as a safety measure for individuals working in nearby active underground mines, and partly to ensure that AMD does not accidentally reach the surface), water is pumped out of the Jordan Mine. The water is then delivered to the Dogwood Lakes AMD Plant where the acid and heavy metals are treated or removed.[3] The treated water is then discharged into a surface stream.

The Jordan Mine pumps and the Dogwood Lakes AMD Plant are owned and operated by affiliates of ACNR, two of which are named parties in this appeal: West

---

[3] Ambit's permit application also contained the following statement:

There is no direct discharge from the Joanne Mine to the surface. The Joanne Mine is completely flooded and is surrounded by abandoned flooded mines that are all hydraulically connected through barrier seepage. This co-mingled mine water discharges . . . several miles away with final treatment at the Dogwood Lakes AMD Plant.

Virginia Land Resources, Inc., and Marion County Coal Resources, Inc. For the sake of simplicity, we refer to these companies by the initials of the parent company.[4] ACNR is the only organization that pumps and maintains the water levels in the Fairmont Mine Pool. ACNR also pays all the costs of pumping and treating the AMD at the Dogwood Lakes AMD Plant.

## B. The Permit In Dispute

West Virginia Code § 22-11-8(b)(7) (2015) provides that it is "unlawful for any person, unless the person holds a permit therefor[,]" to inject "industrial wastes" (like acid mine drainage) underground. The West Virginia Department of Environmental Protection ("DEP") issues "underground injection control" permits that regulate companies like Ambit which seek to inject AMD down well bores into underground mines. W. Va. Code § 22-11-8(a). *See generally*, 42 U.S.C. § 300h (2005) (requiring states to create "underground injection programs" to protect underground sources of drinking water); 47

---

[4] ACNR is a successor to Murray Energy Holdings Company. Murray Energy voluntarily entered Chapter 11 bankruptcy in October 2019, reorganized or sold its assets, and emerged from bankruptcy in August 2020. Marion County Coal Resources acquired and operates an active underground coal mine (aptly named the "Marion County Mine") near the Joanne Mine. West Virginia Land Resources acquired various mined-out properties as well as the Dogwood Lakes AMD Plant. A separate affiliate of ACNR and a non-party to this action is Harrison County Coal Resources, Inc., which operates an active underground coal mine to the south and west of the Marion County Mine.

ACNR affiliates maintain other nearby pumping and treatment facilities in the Fairmont Mine Pool, such as the Lwelleyn AMD facility at the Consol No. 9 Mine northeast of the Joanne Mine, and the Thorne AMD facility at the Consol No. 20 Mine to the south of the Joanne Mine.

C.S.R. § 13 (setting forth "criteria and standards for the requirements which apply to the State Underground Injection Control Program (U.I.C.).").

In 2014, Ambit applied for and received an underground injection control permit from the DEP. That permit allowed Ambit to dispose of an average of 52,120 gallons of AMD "injectate" into the Joanne Mine per day, but no more than a maximum of 86,400 gallons per day. Had Ambit injected the maximum permitted amount of AMD, it could have legally injected as much as 31,536,000 gallons per year under the 2014 permit. That permit expired in 2019.

In 2020, Ambit filed the "Permit Reissuance Application" at issue in this case seeking authorization from the DEP to continue injecting AMD into the Joanne Mine. However, the application sought a five-fold increase in the daily injection volume, from the 52,120 gallons per day allowed under the 2014 permit to an average of 266,400 gallons per day, but no more than a maximum of 280,000 gallons per day. Ambit's application essentially sought permission to inject, at the maximum daily amount, up to 102,200,000 gallons annually.

The DEP issued a new underground injection control permit to Ambit on May 29, 2020 (and issued a slightly modified permit two weeks later). The permit allowed Ambit to inject the increased volumes of AMD that were sought in Ambit's permit application.

5

West Virginia Code § 22-11-21 (1994) provides that "[a]ny person adversely affected by an order made and entered" by the DEP or who is "aggrieved by the terms and conditions of a permit" may appeal to the Environmental Quality Board ("the EQB"). ACNR and its subsidiaries appealed and challenged Ambit's permit on June 26, 2020.[5] ACNR alleged that the DEP failed to recognize that Ambit's 2020 permit application was incomplete and misleading. For instance, ACNR noted that Ambit's application represented that the millions of additional gallons of liquid AMD it planned to inject each year would be "insignificant" to the water elevations in the Fairmont Pool. ACNR also noted that the application represented that the additional gallons would have no significant effect on the volume or quality of water treated at ACNR's Dogwood Lakes AMD Plant. ACNR argued that these representations were untrue.

Ambit countered ACNR's appeal by asserting that ACNR had failed to establish it was "adversely affected" or "aggrieved" by the 2020 permit. Thereafter, the EQB held several evidentiary hearings on ACNR's objections to the permit.

---

[5] ACNR alleged it did not challenge Ambit's permit at the application stage because Ambit's public notice of the application was misleading and failed to give ACNR notice that its rights were affected. Specifically, the public notice claimed Ambit wanted to "continue injecting AMD sludge" and other solids into the Joanne Mine that would remain there. However, the public notice made no mention of the millions of gallons of liquid AMD that would annually flow through the Fairmont Mine Pool that was discussed in the permit application. The EQB did not discuss the public notice in its order, and we do not consider its effect in this appeal. *But see* W. Va. C.S.R. § 47-13-14.28 (2022) ("All persons . . . who believe any condition of a draft permit is inappropriate . . . shall raise all reasonably ascertainable issues . . . by the close of the public comment period.").

## C. The EQB's Order

In an order dated September 29, 2021, the EQB concluded that the DEP's issuance of Ambit's permit was arbitrary, capricious, and in violation of applicable statutory and regulatory provisions governing the process for issuing permits. First, the EQB concluded that ACNR could pursue its appeal because it was adversely affected by Ambit's actions under the 2020 permit. Next, the EQB found that Ambit's 2020 permit application did not contain accurate information regarding Ambit's actual injection rates into the Fairmont Mine Pool. While Ambit claimed in its 2020 application that it was complying with the then-expired 2014 permit (which allowed Ambit to inject an average of 52,120 gallons per day up to a maximum of 86,400 gallons per day), the data Ambit provided to the DEP showed it was actually injecting an average of 216,433 gallons per day – four times greater than what Ambit's permit application indicated was true. The evidence also showed Ambit was injecting clean stormwater into the Joanne Mine. However, the 2014 permit only permitted the injection of AMD, and Ambit represented stormwater was being discharged into a nearby stream under a different permit. The DEP failed to consider these flaws in Ambit's application.

The EQB also concluded that Ambit's 2020 application did not establish a reliable flow path and final destination for the AMD. Ambit claimed in its application that the AMD pumped into the Joanne Mine would flow *eastward* toward ACNR's Dogwood Lakes AMD Plant. However, in 2014, the United States Office of Surface Mining issued a report on the Fairmont Mine Pool which found that water in the Joanne Mine flowed

*north and south* (and into different mines owned by ACNR).[6]  An expert testified that the mined-out Pittsburgh coal seam to the east of the Joanne Mine is *higher* in elevation than the Joanne Mine and that for Ambit's application to be correct, water "would essentially have to flow uphill" to reach the Dogwood Lakes AMD Plant.  Evidence showed that ACNR operated other AMD treatment facilities in the region that regulated the level of water in the Fairmont Mine Pool, and those facilities would be required to bear the cost of pumping and processing any excess AMD injected by Ambit into the Joanne Mine.[7]  Regardless of which way the untreated AMD flows, the EQB found that once Ambit injected it into the Joanne Mine, ACNR would incur extra costs pumping and treating the water.  The EQB also found that Ambit's application incorrectly stated there were no active mining operations in the area surrounding the Joanne Mine that would be threatened by increased water levels in the Fairmont Mine Pool.

---

[6] *See* United States Department of the Interior, Office of Surface Mining, Technical Support Division, *Final Report Fairmont, West Virginia Mine-pool*, 29-30 (March 2014) (stating that "leakage from the Joanne mine enters both the Consol 9 [mine to the northeast] and Consol 20 [mine to the south]," and that water flows *in* to the Joanne mine from the eastern Bethlehem 44 mine).

[7] ACNR claims it costs about $0.04 per hundred gallons of AMD to operate the Dogwood Lakes AMD Plant.  Assuming Ambit injects 80,000,000 gallons of AMD per year that is eventually treated by ACNR, ACNR estimates it would incur approximately $32,000 in costs every year to treat Ambit's AMD at the Dogwood Lakes AMD Plant.  However, other plants owned by ACNR have higher operating costs; the nearby Llewellyn and Thorne AMD facilities, which also process AMD from the Fairmont Pool, incur costs of about $0.62 per hundred gallons to operate, and the same 80,000,000 gallons would cost about $496,000 per year to be processed.  The record is unclear how each facility would be impacted by Ambit's Joanne Mine injectate, in part because none of the parties has done a comprehensive study of water flows through the Fairmont Mine Pool.

The EQB examined the DEP's permit review process and found that the DEP had engaged in a hurried and perfunctory review of Ambit's application, ignoring its many flaws.[8] The EQB further found that the DEP failed to consider Ambit's non-compliance with the 2014 permit when it decided to issue the 2020 permit. In summary, the EQB concluded that the DEP failed to properly assess the effect of Ambit's injection plan on the Fairmont Mine Pool, the surrounding mine operations, or the streams, lakes, and other waters of the State. Therefore, the DEP's decision to approve the application was arbitrary, capricious, and in violation of applicable law governing the issuance of underground injection control permits.

As a remedy, ACNR argued that the EQB should fully reject Ambit's application and void the 2020 permit. The EQB, however, thought a better route was to modify the permit. The EQB's September 29, 2021, order reduced the higher quantities sought by Ambit and ordered that Ambit would only be permitted to inject the same amounts of AMD approved in 2014 (that is, an average of 52,120 gallons per day, up to a maximum of 86,400 gallons per day).

ACNR's subsidiaries now appeal the EQB's order, contending that the EQB should have rejected Ambit's application (Appeal No. 21-0845). Ambit filed two separate appeals of the EQB's order (Appeal Nos. 21-0885 and 21-0893), arguing that ACNR had

---

[8] The EQB discovered that one DEP geologist reviewed Ambit's complicated application and "signed-off on it the same day that he received it."

9

no right to appeal the DEP's permit and that the EQB's order failed to fully incorporate Ambit's arguments and evidence. We consolidated the appeals for consideration.

## II. Standard of Review

When a party seeks to appeal an order by the EQB that denied an application for a permit, or which approved or modified the terms and conditions of a permit, West Virginia Code § 22B-3-3(a) (2018) requires that a petition for appeal be filed with this Court within 30 days of the issuance of the board's order (unless the parties unanimously consent to review in the Circuit Court of Kanawha County).[9]

---

[9] "Any person, or the secretary [of the DEP], as the case may be, adversely affected by an order made and entered by [the EQB] after an appeal hearing" has a right to seek judicial review of the order. W. Va. Code § 22B-1-9(a) (2018). West Virginia Code § 22B-3-3 (2018) requires that different order types be reviewed by different courts, and provides, in part:

(a) As to cases involving an order denying an application for a permit, or approving or modifying the terms and conditions of a permit, the petition shall be filed in the Supreme Court of Appeals within 30 days of the board's order: Provided, That, if all parties consent to it, the proceedings may continue in the Circuit Court of Kanawha County;

(b) As to cases involving an order revoking or suspending a permit, the petition shall be filed in the circuit court of Kanawha County; and

(c) As to cases involving an order directing that any and all discharges or deposits of solid waste, sewage, industrial wastes, or other wastes, or the effluent therefrom, determined to be causing pollution be stopped or prevented or else that remedial action be taken, the petition shall be filed in the circuit

Continued . . .

Furthermore, West Virginia Code § 22B-1-9(a) (2018) requires a court to review an order of the EQB pursuant to the provisions of West Virginia Code § 29A-5-4(g) (2021) of the Administrative Procedures Act.  Under the Act, a court reviewing an order by the EQB may affirm the order or may remand the case for further proceedings.  However, the court must reverse, vacate or modify the order or decision of the Board if the substantial rights of the petitioner or petitioners have been prejudiced because the Board's findings, inferences, conclusions, decisions and/or order are: (1) In violation of constitutional or statutory provisions; (2) In excess of the statutory authority or jurisdiction of the agency; (3) Made upon unlawful procedures; (4) Affected by other error of law; (5) Clearly wrong in view of the reliable, probative, and substantial evidence on the whole record; or (6) Arbitrary or capricious or characterized by an abuse of discretion or a clearly unwarranted exercise of discretion.  *See* Syl. Pt. 2, *Shepherdstown Volunteer Fire Dep't v. Human Rights Comm'n*, 172 W. Va. 627, 309 S.E.2d 342 (1983).  "The 'clearly wrong' and the 'arbitrary and capricious' standards of review are deferential ones which presume

---

court of the county in which the establishment is located or in which the pollution occurs.

We note that West Virginia Code § 22B-3-3 was enacted before the creation of the West Virginia Intermediate Court of Appeals.  *See* W. Va. Code § 51-11-3 (2021).  Further, the Legislature may wish to consider that West Virginia Code § 22B-3-3 might conflict with West Virginia Code § 29A-5-4(b) (2021) (providing those administrative orders issued after June 30, 2022, must be appealed to the Intermediate Court of Appeals).  Because the order on appeal was issued in September of 2021, we need not reconcile the interaction between West Virginia Code §§ 22B-3-3 and 29A-5-4(b) in this appeal.

an agency's actions are valid as long as the decision is supported by substantial evidence or by a rational basis." Syl. Pt. 3, *In re Queen*, 196 W. Va. 442, 473 S.E.2d 483 (1996).

With these standards in mind, we examine the parties' arguments.

### III. Discussion

As we noted earlier, both Ambit and ACNR are appealing the EQB's order. However, many of their arguments and assignments of error overlap. Accordingly, we choose to consider their contentions together, beginning with those we find most important.

The first assignment of error we consider is Ambit's assertion that ACNR and its subsidiaries did not have the right to pursue an appeal before the EQB. Under the Water Pollution Control Act (W. Va. Code §§ 22-11-1 to -30), a party that is adversely affected or aggrieved by a decision of the DEP to permit the injection or placement of any liquid into underground strata (as regulated by W. Va. Code § 22-11-8) may appeal and seek review of the decision before the EQB. West Virginia Code § 22-11-21 provides (with emphasis added):

> Any person *adversely affected* by an order made and entered by the director [of the Department of Environmental Protection] in accordance with the provisions of this article . . . or *aggrieved* by the terms and conditions of a permit granted under the provisions of this article, may appeal to the environmental quality board[.]

Ambit vigorously argues that ACNR was not "adversely affected" or "aggrieved" because it failed to identify any injury or loss arising from Ambit's injection of AMD into the Fairmont Mine Pool. Ambit concedes that ACNR incurs costs pumping and treating water

12

from the Fairmont Mine Pool, but it argues that ACNR voluntarily accepted that responsibility and has failed to identify any regulation, statute, ordinance, or contract which mandates that ACNR is entitled to control injections into the pool. On the contrary, Ambit claims that there is nothing in the underground injection control permit process that requires a permit holder to obtain permission from an AMD treatment facility operator before injecting AMD.

Alternatively, Ambit posits a straw man argument by asserting that, because ACNR raised the increased costs it could incur from Ambit's increased AMD injections, it was, in effect, demanding monetary damages for the losses caused by those injections. Because the EQB has no statutory authority to issue monetary damages, Ambit then argues that the EQB had no authority to review ACNR's appeal or to consider ACNR's pleas to change how the Fairmont Mine Pool operates.

Having reviewed the record, we find no merit to Ambit's argument. The EQB's authority to review an appeal is established when the appealing party shows it has been "adversely affected" by a decision or "aggrieved by the terms and conditions of a permit." The relevant statutes do not furnish a meaning for "adversely affected" or "aggrieved," but that is of no moment. "In the absence of any definition of the intended meaning of words or terms used in a legislative enactment, they will, in the interpretation of the act, be given their common, ordinary and accepted meaning in the connection in which they are used." Syl. Pt. 1, *Miners in General Group v. Hix*, 123 W.Va. 637, 17 S.E.2d 810 (1941), *overruled, in part, on other grounds by Lee–Norse Co. v. Rutledge*, 170 W.Va.

13

162, 291 S.E.2d 477 (1982). The *American Heritage Dictionary* says something is adverse when it is "[c]ontrary to one's interests or welfare; harmful or unfavorable."[10] The *Merriam-Webster Dictionary* likewise says "adversely" means something done "in a way that is bad or harmful."[11] *Black's Law Dictionary* says that "affect" means "to produce an effect on" or "to influence in some way," while the term "aggrieved" means a party "has legal rights that are adversely affected" or "harmed by an infringement." [12]

In light of these common, ordinary and accepted definitions, we hold that under West Virginia Code § 22-11-21, a person is "adversely affected" by a decision or "aggrieved" by the terms or conditions of a permit when the person shows some legal right or interest that is influenced, by either the decision or the terms and conditions of the permit, in an articulable way that is harmful or contrary to the person's right or interest. *See, e.g., Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990) ("[T]o be 'adversely affected or aggrieved . . . within the meaning' of a statute, the plaintiff must establish that the injury he complains of (his aggrievement, or the adverse effect upon him) falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint."); *Roe v. Bd. of Cnty. Comm'rs, Campbell Cnty*.,

---

[10] *Adverse, American Heritage Dictionary of the English Language* (5th ed. 2011).

[11] *Adversely, Merriam-Webster.com Dictionary*, Merriam-Webster, https://www. merriam-webster.com/dictionary/adversely. Accessed Jun. 14, 2023.

[12] *Affect* and *Aggrieved*, *Black's Law Dictionary* (11th ed. 2019).

14

997 P.2d 1021, 1023 (Wyo. 2000) ("An aggrieved or adversely affected person is one who has a legally recognizable interest in that which will be affected by the action."); *Jefferson Landfill Comm. v. Marion Cnty.*, 686 P.2d 310, 313 (Ore. 1984) ("'[A]dversely affected' means that a local land use decision impinges upon the petitioner's use and enjoyment of his or her property or otherwise detracts from interests personal to the petitioner.").

The evidence adduced below showed that ACNR had long-established interests in maintaining water levels in the Fairmont Mine Pool, and that the DEP's issuance of the 2020 permit to Ambit would undermine those interests. The evidence showed that, regardless of which way Ambit's untreated AMD flows through the Fairmont Mine Pool, ACNR would eventually incur some share of the effort and cost of pumping and treating the drainage water. In fact, even Ambit, in its application, stated that the AMD it injected would be pumped and treated by ACNR facilities. ACNR did not seek monetary damages when it filed its appeal, but rather sought some consideration by the EQB and the DEP for the impact Ambit's actions would impose on ACNR's operations. Accordingly, we find no error in the EQB's determination that ACNR had a right to appeal the DEP's decision to issue the 2020 permit.

The second assignment of error concerns the EQB's decision to reduce the volume of AMD that Ambit would be allowed to inject under the 2020 permit. ACNR argues that the DEP may only act upon an underground injection control permit application

15

that is both complete and accurate.[13]  Once the EQB found that the DEP had abused its discretion and acted arbitrarily and capriciously, relying upon Ambit's incomplete and inaccurate application, ACNR argues the EQB was required to completely vacate the permit.

Additionally, ACNR contends that the EQB has no power to modify a permit. In support, ACNR cites to a federal case relying upon federal law stating that "[w]hen a court finds an agency's decision unlawful under the Administrative Procedures Act, vacatur is the standard remedy." *Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin. Nat'l Marine Fisheries Serv.*, 109 F. Supp. 3d 1238, 1241 (N.D. Cal. 2015) (citing 5 U.S.C. § 706(2)(A) which provides that a "reviewing court shall . . . set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]").  Alternatively, ACNR argues that the EQB erred by, in effect, treating Ambit's 2020 permit application as a modification of its 2014 permit (which expired in 2019) rather than a completely new application.

We reject ACNR's position because this case is not governed by federal law but rather West Virginia law, and West Virginia law expressly empowers the EQB to

---

[13] The Code of State Regulations provides that the DEP may not issue a permit "before receiving a complete application" (47 C.S.R. § 14-13.10.c (2022)) or without a certification that the application is "true, accurate, and complete."  (47 C.S.R. § 14.13.11.d).

modify permits issued by the DEP. West Virginia Code § 22B-1-7(g)(1)[14] provides that after conducting hearings and considering the testimony, the evidence, and the other materials in the record, the EQB must enter an order "affirming, *modifying*, or vacating the order, permit, or official action of the chief or secretary, or shall make and enter such order as the chief or secretary should have entered, or shall make and enter an order approving or *modifying* the terms and conditions of any permit issued[.]" (Emphasis added). The Legislature plainly authorized the EQB to modify permits issued by the DEP. Accordingly, we find no error in the EQB's decision to do so in this case.

Third and finally, both ACNR and Ambit argue that the EQB's final order failed to address each and every theory that the parties advanced below. Specifically, the parties contend that the final order failed to precisely list all of the evidence, arguments, objections, and admissions against interest that appeared in the record before the EQB. Ambit also argues that the EQB erred in refusing Ambit's "Supplemental Motion to Alter/Amend, Revise/Correct" the final order to incorporate all of Ambit's proposed facts and proposed conclusions of law.

We see no error in the EQB's final order. West Virginia Code §§ 22B-1-7(i) and 29A-5-3 together require the EQB's final orders to be "in writing or stated in the record and . . . be accompanied by findings of fact and conclusions of law. . . . Findings of fact . .

---

[14] The EQB conducted its review under the 2003 version of West Virginia Code § 22B-1-7. However, the Legislature modified the statute in 2023, but no changes were made that affect this appeal. *See* S.B. 188 (effective June 4, 2023).

17

. shall be accompanied by a concise and explicit statement of the underlying facts supporting the findings." West Virginia Code § 29A-5-3 certainly allowed Ambit and ACNR to "propose findings of fact and conclusions of law," but the parties point us to no statute, rule, or regulation that requires the EQB to adopt and incorporate into its final order each and every theory, argument, or proposed interpretation of the facts made by a litigant. We find the EQB's final order to be a concise but clear summary of the record, and its discussion of the facts and the parties' theories were fairly within the bounds of the EQB's exercise of its discretion.

## IV. Conclusion

The EQB's factual findings are supported by the reliable, probative, and substantial evidence on the whole record, and its conclusions were neither arbitrary nor capricious nor characterized by an abuse of discretion. Accordingly, we must affirm the EQB's September 29, 2021, order.

Affirmed.